Honors, the first case of the morning called 2080876, People of the State of Illinois v. Jennifer McMullan. On behalf of the Avalanche, Mr. Kevin Kennebry, on behalf of the Avalanche, Ms. Karen Piscitelli. Thank you. Good morning. I'm sorry, we're starting a couple minutes late this morning. Mr. Bry. Mr. Bry, I'm going to ask you to adjust the microphone and point it up towards you. Thank you. And speak as loudly as you can, please. Will do. Thank you. If I could indulge the court, I wanted to double check on the time limitations and make sure they hadn't changed on the argument time. Fifteen minutes and five minutes. Okay, thank you very much, Your Honor. Back in April of 2002, my client, defendant Jennifer McMullan, was convicted of first-degree murder under what was essentially an accountability for driving a car allegedly used to drop off and then pick up some individuals who engaged in an armed robbery attempt which went wrong, regrettably resulting in the tragic death of one Raul Racino. She was convicted after a jury trial and her conviction was affirmed on direct appeal. She later filed a post-conviction petition in 214-01 petition that was initially dismissed by the trial court that was remanded. We had a full evidentiary hearing, which is the subject of this appeal today. The essential issues which the defendant raised in her petitions were that there was newly discovered evidence and or wrongfully withheld evidence by the state, which in the main involved and grew out of the failure to be tendered reports indicating that some other individuals had allegedly confessed to commission of this crime leading to the testing, inconclusive testing of a pistol and evidence which grew out of that. I know that the court, the justices are familiar with the evidence, so I'll only summarize some of the evidence. Suzanne DiCiccio, another individual, a young lady, on at least 10 different occasions to close family members and even to police in custody confessed in incriminating comments indicating that she and two individuals that she was with were responsible for the armed robbery and regrettable murder. The trial judge made a credibility finding with regard to her testimony in this evidentiary hearing, correct, both for the 214-01 and... That is correct. Okay, and he questioned her credibility. Well, he certainly did. Based on a number of factors, including the fact that she was a heroin addict, correct? He certainly did. However, you know, that credibility finding is based on his determination of what she was saying at this post-conviction hearing. But he's admitting it was a Brady violation. That seems to be acknowledged and admitted here. But his credibility finding is directed to the post-conviction hearing all these years later. But the real nut of the situation here is what about her credibility when she made these 10 and more different confessions? If I could suggest something. There are voluminous facts, and we've all read the facts, and if you could discuss the legal points you're going to raise, such as the Brady, violation of Brady, and tell us why you feel it was a violation of Brady, why you feel that we should enforce the alleged agreement between your client and the police. Certainly, certainly, we'll do that. Because your time is limited. Yes, all right, we'll do. And, you know, the Brady violation has been conceded by the state here, and the real standards that we're looking at here in terms of what was not turned over is whether our confidence in the jury verdict would be undermined or not. The trial judge made his findings on that standard as follows, and I'm quoting his written opinion. He says the newly discovered admissible evidence is not conclusive. That's the word he used. The newly discovered evidence consists of admitted lies told by a heroin addict to avoid being held in police custody and to avoid prosecution for obstructing justice. The newly discovered evidence would not probably change the result at trial. That's a direct quote. Isn't that the standard for Brady, that the evidence is material, that there's a reasonable probability that the results in the trial would change? It's not the standard under the Post-Conviction Act. Under the Post-Conviction Act, there's an admitted Brady violation here. Under the Post-Conviction Act, the standard is that the defendant does not have to prove by a preponderance of the evidence that she would have been acquitted, that the result would be different. What is required under the Post-Conviction Act for newly discovered evidence, not only the Brady material, but the other evidence that developed out of that that was brought out at the hearing here. The Post-Conviction Act standard is whether it would put the whole case in such a different light as to undermine confidence in the verdict. You don't have to prove by any preponderance of evidence that you would have won. And it would have certainly put this whole trial in a different light. What constitutional violation are you relying on for purposes of your post-conviction petition? Due process in terms of having access to the full evidence that the state… That's the Brady violation. Exactly. So you have to prove the Brady violation to get the constitutional violation. That's correct. They merge together. That is correct. And again, I do feel that the violation has been acknowledged by the state and was assumed by the court. The only thing that got acknowledged by the state was the fact that they had evidence in their possession and did not turn it over to the defendant before trial. Right. But the other element of Brady is, as Judge Shostak pointed out, that there must be sufficient evidence that there would likely be a reverse line paraphrasing it. That's correct. So the police did not admit that, nor did the appellees.  But I do feel that Brady is satisfied here, that this evidence is of such a quantum and such a magnitude. And merely the… And again, remember, for post-conviction purposes, it's also what derives from the withheld evidence. Now, for instance, maybe the withheld evidence only talked about the gun and what Suzanne DiCicco said, but there was also then corroborating evidence developed at trial, and that's where we get into the post-conviction standards. But I do feel that the Brady violation here was met, that had a jury understood this… First of all, there's no guarantee that if this evidence had been disclosed and known to the defendant, it would not be likely that she would have defended only on an accountability theory, that she may very well have defended on innocence trying to point the finger to these other individuals who have repeatedly implicated themselves. So the whole trial may have been different. And I believe that the result would have been different if this could have been done to the jury. Now, when you look at what the trial court focused on, he pooh-poohed a lot of the corroborating evidence that came out of what Ms. DiCicco said. And it wasn't just Ms. DiCicco, if I'm pronouncing her name correctly, who implicated herself. The other individual, Mr. Hyland, implicated himself, too. It's in the record that he acknowledged to police that he and DiCicco had said these things. And I believe that the question of the admission of the Hyland declaration has been briefed and that that was a chamber's exception there on the hearsay, that that should have been considered. But there is also corroboration within the Brumette household as to whether the gun was missing or not. It seems to be inconsistent, that testimony, but there's evidence that it was. Isn't that testimony that, as you just acknowledged, it is inconsistent testimony? And I think that DiCicco and the two men also kind of backed off as to why they did take the gun. But isn't that inconsistent evidence in conjunction with the totling's confession and the fact that the cops found the ski masks there, the black jacket or the green jacket there? Can't the judge weigh that credibility, those credibility standards, in the post-conviction petition hearing to make the determination? He has to. He has to. And did he not do that in this case? I don't believe he did. I do not believe he did. I believe that he discounted evidence and didn't weigh it and wrongfully discounted evidence. He discounted a lot of other corroborating evidence that he never mentioned in the opinion. Like what? Like the fact that the Brumette family all discussed the fact that that looks like Rusty. You know, that was said to Suzanne DiCicco. That Suzanne DiCicco, whom the judge found credible, acknowledged that that gun, she believed that gun was missing that night. She saw it wrapped in the towel. You know, the judge can't say on the one hand, I find her credible. On the other hand, they don't. When they're talking about, what do you mean? I mean, the judge talked about various aspects of the evidence and actually by discussing various issues or aspects of the evidence, weighed the credibility and came to a conclusion. I'm not sure I'm following where you're saying he didn't take it all into account. Well, he may have taken it all in. Well, he didn't acknowledge certain things. But even assuming he took it all into account, I say it's manifestly erroneous. I say it was not reasonable. The fact that you have all these different confessions out there in all these different settings of reliability, that in and of itself is something that's potent in terms of whether it might put a different cast on this trial and undermines our confidence. The fact that the gun, which Suzanne DiCicco said was with them that night, the fact that it had similar characteristics and caliber and could have been used as uncontradictedly testified to by Mr. Hill based on Suzanne DiCicco's statements that it had been used in this fashion when she said that before that had been public knowledge. She also had different versions of where the gun was, whether it was in a car trunk or elsewhere, who obtained it, when it was obtained, where it was kept. I mean, there was nothing about it that was consistent, right? Well, in that case, how can the judge's credibility finding on DiCicco be ascribed, you know, respect by this court? The husband, David, testified that the gun never left the house except when the son took it out to do some shooting practice and the gun was in the closet and he had conflicting testimony. You had conflicting testimony? Well, I believe that David is talking about one side of it and the judge took the position that there was conflicting testimony regarding whether the gun ever left the house. I believe that David, the husband, did say that to the police. I don't believe he testified at the hearing. But the wife, who had equal knowledge and access, had said not only to police but at the hearing that she still thought it had been missing that night. So, I mean, yes, it is conflicting. It is inconsistent. I know that it's a mess. It's a mess, all of this. And it would be a mess on retrial. But that would make the difference, I believe, in this case. Well, let me explain this. The big factor is your client confessed, number one. And your client was convicted, number two. And after she was convicted, she again made a statement to the police, which admitted the crime and was willing to testify under oath to that fact. Now explain away why, at this point in time, you think the result of the trial would be different. I believe that in spite of that confession, which while it may have been found to have satisfied Fourth Amendment standards by this court previously, I do believe that in terms of the weight given to that, after 13 hours in custody, after not having her full medications at the time, I believe that's a question for the jury. I'd like to argue how much weight should be given to that confession, too, if we had all of this contrary evidence or even the most important contrary evidence that could be shared with the jury. Yes, there was incriminating statements and I would say a somewhat ambiguous confession on the part of defendant here. There was a guilty plea by a co-defendant. I'm aware of that. I'm not so impressed with the ski mask or the green jacket, because there's been no medical or scientific time of anything linking these defendants to this crime specifically. Ski masks are not uncommon things. That, I think, you could argue to the jury that there's a reasonable doubt here as to the guilt of the defendant. And who knows? Maybe had she had this information, maybe the pleas would have been different. It would have put a whole different light on this crime. What's our standard of reviewing the judge's ruling regarding the 214-01 and the PCP? On the post-conviction, it's manifestly erroneous to my understanding. And on the 214-01, if I'm not mistaken, I believe it's a piece of discretion. It's the standard of review. I would like to say a couple words also on the memorandum of understanding issue, unless you have another question. Yeah, I wanted to make some comments regarding the so-called agreement between the state's attorney and your client and why that agreement should be enforced or not enforced. I believe it should be enforced or remanded for new sentencing. The assistant state's attorney who tried the underlying case, not only of the defendant but of a co-defendant, it's in the record I cited, came forward to the court, indicated he thought that there could be unjustness or lack of fairness here. If, in those words he used, if the defendant should bear the brunt of all of this and wouldn't assist them in trying to convict Mr. Smith. What inconsistencies were there with respect to her testimony versus the understanding of the state's attorney? There were two things at issue. One was, and I believe that this is pretextual on the state's part at the time, the first thing that allegedly was at issue was the question of when a defendant and her co-defendants had gone to a convenience store called a Cloud 9 store. Defendant apparently as far back as 2001 when she made incriminating statements said that was a couple hours after the fact. I don't know if that was true at the time but the defendant had said so. The state understood that it was 10 or 20 minutes after the crime occurred and it's really not material because the state had evidence of a videotape from the convenience store that said it was 7.39 p.m. But the issue at trial for the fact finder, the jury, is her credibility. And she was going to be put on as the state's witness, correct? Correct. So that was that point. That discrepancy could have been seen to be material. Could it not in that context? It could have but the state knew that. That went into the memorandum of understanding. They knew that there was a discrepancy. They entered the memorandum of understanding. Anyhow, there's good faith and fair dealing in any contract. You can't make a contract. Law applies here. You can't make a contract with somebody and then knowing that it's impossible for them to comply, you can't interpret this contract that way. That's good faith and fair dealing. That's a good point. Here's my question. This wasn't really briefed. But is this really a contract if I say build me a house and if I like the house, I think it's well built, I'll pay for it? Is that a contract? That wouldn't be because there's no consideration. But there's consideration here. There is consideration on both ends. They had their obligation and she had to cooperate and she did cooperate. She met with them over and over. The state's attorney at the hearing said he didn't claim that she hadn't cooperated. They merely chose not to call her. The consideration is a premise for a premise. In the example I gave you, you build me a house and I'll pay for the house if I like it. Okay, I promise to build you a house. Here, the defendant says I promise to testify in court. It's what the statement I gave, the statement I gave to the system. And the state's attorney had the power to decide whether or not the defendant effectively cooperated with the text of that statement. And if he believed that she didn't, he had the right to, quote, withdraw his commitment. He had that right, but she didn't just promise to testify because that's not her decision. She can't testify all by herself. She has to be called and approved by the court. The agreement was that if she was called to testify, she would testify. I agree with that. She didn't have to testify, but the agreement was that if she was called to testify, she would testify in a certain way. And she wasn't called to testify, but the agreement required her to meet with them, to cooperate, to help them. I have set forth the language of the agreement. Give truthful and consistent testimony. Exactly. But there has to be a material. If the state is justified in not following through, they have to show that she materially failed to hold up her end of the bargain. That's basic contract law. Who decided that and what was the language used relative to the power of the state's attorney to revoke? There's nothing specific in terms of powers to revoke, but there is in the agreement, the state has the discretion of, it says, if the McHenry County state's attorney in his reasonable opinion, reasonable opinion, it says, not confederate's opinion, reasonable opinion, says that defendant has violated the agreement, the agreement becomes null and void. I'm saying there is nothing in this record that says that she unreasonably violated this agreement. Well, he was the one who was going to put on all the witnesses and had at his command all of the facts of the case. So it's pretty hard to say in that context that it wasn't reasonable, isn't it? No, I think it's not hard for me to say. That Cloud 9 issue was a boogie issue. They knew that it was already out there. She had to be consistent or she was darned if she didn't, darned if she didn't. If she had changed her testimony and said, maybe it wasn't two hours later, it was actually 20 minutes later, 10 minutes later, she would have been being inconsistent and they could have said, we think she's not being consistent. What about the statement of her attorney who said, well, she's not going to testify consistently or truthfully, but we have to look at what the transcript said of the video? He, by that conduct and what he said ahead of time, he implied, did he not, that her testimony was not going to be consistent with the testimony or the statement given on June 6th. Now, if you put yourself in the shoes of the prosecutor, isn't that virtually announcing that her testimony is not going to be truthful? No, I don't believe that it is. I believe that it is showing that she is trying to comply with the agreement. Well, but it wasn't just trying to comply with the agreement. It was not, she's going to try to comply, was it? Yes, that she would comply and that she needed to do this to do so. The agreement was that she would testify in compliance with the prior statement she had, the video statement. Yes. And in the video statement, I believe she testified that Collette and, is it Smith, I believe, or Holt, Holt, Holt, Holt, Holt, however you pronounce his name, left the house two hours afterwards. And state supplements indicated that that would be impossible because they were at that liquor store. Convenience store. Yeah. A convenience store. Right, which was all known to the state. Within 10 minutes of the time. But this was all known to the state, so it could not have been the subject of a material breach. The parties knew it. If this agreement is ambiguous, and I think it certainly is in senses that we're discussing what exactly did it mean, this was all known to the state. So this can be considered by you in terms of interpreting this agreement. She had to be unreasonable in her attempts to cooperate, and I think she was being reasonable in her attempts to cooperate. Now, this agreement did not bind the court in any way, did it? Did not bind the court. And if I were to be the one on remand in a new sentencing argument in front of the court, I have to acknowledge that. I wouldn't be the one, frankly. I'm an appellate attorney. But that doesn't mean that it shouldn't be complied with by the state and that the sentencing hearing shouldn't take place under what was bargained for here. Could the court still refuse to vacate the conviction even if this memorandum were enforced? I believe that the court could, and the question would be whether that is something that could be challenged. I think it could be challenged, but the court has the power not to do it. But the state's attorney said on the record that this matter was conferenced under 402, to my understanding, and the state's attorney said there's no reason to believe that the court wouldn't. So the defendant wants her fair day at that fair sentencing hearing. You will get some additional time on rebuttal. We have gone over a number of complicated facts here. Thank you very much. Thank you. Ms. Piscitelli. Good morning. Good morning. Good morning to the court, counsel. I'd like to begin just by starting with that motion to compel memorandum of understanding and just point out that I think, Your Honor, you nailed it on the head at that last comment there about what her trial counsel pointed out to the court. Let me stop you right there. Oh, sure. How does that bind the defendant? Because the agreement was the defendant would testify in accordance with the previous video statement she made. She said it would be truthful testimony, not to be inconsistent with that, implying that that's what everyone had agreed on, that that was truthful. Now, when her trial counsel said, wait, I need more time, we need to go over the transcript, and basically said, I'm going to just read this because I think it's important. And since our plea agreement can't be fulfilled, it has to be truthful testimony or testimony consistent with her prior statements. I have to try and work that out with Jennifer. Otherwise, it can't be both under these circumstances. So I want to review the testimony with her. Basically saying, hey, we said that that was going to be confirmed. He didn't make the agreement. She made the agreement. Exactly. But the agreement was that it would be truthful and consistent, implying that the truthful was consistent. Now he's saying to be truthful. I'd like to just hear her answer that. To be truthful, it can't be consistent. Her counsel's admitting that to the court and to the prosecutor. The prosecutor has a duty not to put anybody on the stand that believes will be untrustworthy or unreliable. I mean, I talked to the state attorney. I called him up and said, okay, what was the deal here? You know, I wanted to know. And he said, well, you know, I had my doubts all along. A little bit of records. Right. I'm sorry, but regardless. Basically, this is what did it. I know all those other inconsistencies were just minor. And that's why they were at this hearing. And that's why he was prepared to call her. And that's why he said to the court, I want to call her now. That's in the record. Counsel argues that it's not a material breach. What's your response to that? My response to that is that maybe those inconsistencies that he's talking about, about the time that they were at the gas station, the liquor store, were not material. And that's why he was at the hearing. And that's why he was about to call her. But it would be a material breach to say I want to testify truthfully or I can testify truthfully. However, that would not be consistent with my earlier testimony that before in the agreement I said was the truthful testimony. That's a material breach. That's saying, hey, I'll testify now. But that's not consistent with what I said before was my truthful testimony. I'm changing what's the truth. The truth's new. She didn't say anything. Her counsel speaks for her. The attorney's not putting can't speak for her. I believe he can. I mean, what do you think of if she would have testified? If you ask for continuances, if you ask for continuances to the trial court, I mean, those are, I mean, I don't know how you can say that her counsel was not speaking for her. Counsel said he wanted to go over the 201 statement with her. Right. And he wanted to make sure that she would testify proper. And the 201 statement was inconsistent with the video statement. He said she cannot testify both truthfully and consistent with those statements. She couldn't testify. So I have to work that out with her. He's saying what she's telling me is not the same as what's in there, even though what we agreed to before with his representation. That's one way to look at that statement. The other way to look at the statement is that you acknowledge there was an inconsistent time statement in 201 and the 206 statement. I think it was 206. I'm sorry, 201 and 206. I'm not following what you mean, 201. In 201, she made a confession to the McHenry police. And after that 201 confession, there were some discrepancies between what she said in 201 and what she said in the videotape statement. And the attorney asked for a recess from the judge, a little time from the judge before the hearing so he could go over the two of the discrepancies between. He wanted to go over the 201 statement, which had discrepancies vis-a-vis the 206 statement. And the assistant state's attorney took that to mean that the attorney wanted to manipulate the client to make sure she didn't make any statements consistent with the 201 statement that were inconsistent with the 206 statement. The assistant did that. And he came to that conclusion. And it's an interpretation of the language that the lawyer made by the assistant state's attorney that the defendant would testify falsely. And I think that's a big relief. And it probably isn't justified because the defendant was not involved. The only test of whether or not she would testify consistent with the 206 statement was if she did testify. And the assistant state's attorney, and I assume also the state's attorney, decided not to call her. And one argument for not calling her is they believed that they had sufficient evidence to convict Smith and didn't need her testimony. But it was a knee-jerk reaction. It could be described as a knee-jerk reaction or an impulse, certainly an impulse by the assistant state's attorney that her attorney wanted to get her to change her testimony, make sure she didn't testify according to the 201 statement inconsistent with the 206. And I think it's proper for the attorney to go in and make sure that she knew what she said in 201 because she would be impeached with that. And what she said in 206. And I think the attorney's representative had a right to have a conference with her on that point. Your Honor, if I may, I don't know why he would need all the transcripts if it was as simple as that. I mean, I don't know how, why he would be asking to review all the transcripts if it was as simple as a time change that he was consistent and he was worried about that weren't consistent. All he would have to do is say, hey, this is what this says, this is what this says. Let's decide what's the truth here. I don't think that's what it is. And I read to you the record of actually what his, her attorney said. And I don't think it's a stretch at all for the state's attorney to think he's totally coaching her. I don't know what she's going to get up and say. And it was his reasonable opinion that she was not going to comply for him to say, okay, we're done. And I think it would have been irresponsible of him to call her on the stand not knowing even if it would have benefited. I mean, she was at a point where she would say anything to get out of it. She probably would have helped him. She probably would have. Do you believe that her attorney had a right to interview his client before she got on the witness stand? I think there's no doubt that there's some, yeah, there's some right to conference with your client. Absolutely. But what I'm saying is that that's not even the issue here. The issue is that the state's attorney felt that she was not complying. It was reasonable opinion. Because he didn't even talk to her. His attorney, I guess. He based his opinion on what the attorney said. I don't understand why the problem is there. I guess it's that her attorney gets to talk on her behalf. In fact, the state's attorney can't talk to her alone. So I guess I'm not clear where there's the problem there. Well, I say the problem is, number one, the attorney, the state's attorney made this decision based on a conversation with her attorney. In open court, on record. And not her. She was present, was she not? She was present. She was present. It was at a hearing. The state's attorney was calling her. And did she speak? Does the record reflect that she spoke up and said anything? She did not speak up and say anything. She didn't deny it. She didn't say, no, no, no, put me on now, or no, I really need to talk to my attorney. She didn't. And what is the obligation of the state's attorney with regard to putting on a witness who he thinks may not be telling the truth He's doing not to do that, in fact. He should not do that. And I think he would have been incorrect in calling her. If you know the defense attorney. Oh, no, the state's attorney. I'm sorry. Maybe I misspoke. I'm sorry. The obligation of the state's attorney with regard to putting on a perjured testimony. Exactly. Any attorney. Exactly. Any attorney, whether it's a state's attorney or any attorney, cannot put on a claim for a witness he knows will perjure, give perjured testimony. Absolutely. But my point is the assistant state's attorney had a gut reaction, a belief that it was going to happen. I don't see that in the record. I mean, I don't see that it was just a gut reaction. I mean, it's clear on the record what her attorney said, and it's clear what the state's attorney. He said he believed. The state's attorney had a reasonable belief, and he said this to the court. You know, but I can't trust what she's going to say. She's not reliable any longer. The reasonable belief was based on the request of the attorney to talk to his client. Not just talk, but review the entire transcripts. Not just conference. I don't remember reviewing the entire transcript. I remember that it was he wanted to talk to her about possible inconsistencies between the 201 statements. Could I direct you? It says at the trial, defendant's attorney requested additional time to completely review the transcript before having defendant testify. That's in my brief on page 33, and it's in the record on page 1782. And what transcript would that be? Transcript of the trial? The transcript of the hearing for the motion to compel and memorandum of understanding. It's the report of the proceedings, 1782. All right. Maybe we should move on to some of the other issues. Let me ask you, since we're running out of time, let's talk about a Brady violation. Why is there not a Brady violation? Well, first of all, the leads were disclosed to, I mean, some of these leads, I think in my brief I talk about how they were listed, the names were listed. And, yes, I can't really argue with the fact that maybe they should have done more and offered more, and I'm not quite sure where the problem was there. And the trial court did say, I recognize that some of this evidence should have been disclosed, and so I'm not disputing that the trial court found that. However, the standard is deferential to the trial court. The standard for undisclosed evidence, it must be sufficient to place the whole case in such a different light as to undermine the confidence in the verdict. And I feel that the trial court was not manifestly erroneous in deciding that that was not sufficient. He had basically two prior inconsistent statements by Suzanne DiCiccio. I'm not quite sure I should with my last name know how to say that, but I don't. And now she's on the stand denying those statements, and he finds her credible now, now that she's no longer a heroin addict, now that she's not telling her family, friends, a million different things, trying to get attention. Now he finds her credible. I think that's a distinction that needs to be made, too, is that he's finding her credible now. He is not finding her prior statements at prior times credible. He makes that distinction. Also, as for the Brummett pistol, we're not even sure it was missing at the time. Vicki Brummett testifies that it was never, quote, unquote, missing. They never discovered it missing. Her husband also had reported to the police that he never knew it was missing. As for this new opinion expert testimony, all of a sudden he has this new theory that's still not even conclusive, and the trial court, I mean, he doesn't ignore any of this. His opinion clearly lays out that he reviewed all this. He just, however, does not believe it's sufficient. And also, it just doesn't undo all the overwhelming evidence we have against the defendant. I mean, she confessed. She implicated her friends Justin and Kenneth Smith and David Collette. Justin also testified consistently with her testimony. He also confessed to the crime and served time. There was eyewitness testimony by Eduardo, part of the employee at Burrito Express, who testified there was a green jacket which Justin testified he was wearing that belonged to David. It was found in Justin's home. There was a black ski mask that he reported one person was wearing that was later found in the defendant's home with Kenneth Smith's hairs on it. The trial court considered all this evidence, and he did consider that the state had failed to disclose this evidence, but ultimately found that the favorable evidence that was undisclosed did not undermine the confidence in the verdict. And because that doesn't seem to be manifestly erroneous, according to the record, he clearly based his decision on the facts that were presented to him. His ruling shows that. I don't think that we can say it was manifestly erroneous. Now, regarding the actual innocence claim, the standard is that it has to be of such a conclusive character that it would probably change the result at trial. And the trial court's ruling also shows careful consideration went to the decision. He based his decision on what he heard at that hearing. And some of the things that were claimed to in her post-conviction petition should have been there. He didn't ever hear those things. All he basically had to consider were prior inconsistent statements of Suzanne. That's all he had. And then he had her testimony that now was saying that was all a lie. That's all he really had to go on. I mean, while this other testimony or this other evidence, the defendant admits it's inconclusive. I mean, it's inconsistent. There's statements flying around. We don't know why those are out there, but they're just not consistent. None of it would reverse the result at trial. None of it. Now, I won't go into the 214-01 petition other than to say that it's also an abuse of discretion standard. So it's also deferential to the trial court because I think it's mostly covered there. The last thing I was going to cover was just the evidentiary issues with Adam Highland's inadmissible hearsay, which I also believe we need to give deference to the evidentiary rulings of the trial court. And he went through the chamber's factors and decided appropriately that it should not be admissible. Do you have any questions? If not, I would ask that you affirm the defendant's conviction sentence. Anything further for this? No. Okay. Thank you very much. Thank you. Mr. O'Brien. I will be very brief. I know the court has been accommodating with time. You know, with respect to that memorandum of understanding, the state's attorney today, the state prosecutor, I should say. Excuse me? I'm sorry, I didn't hear you. The state's attorney today acknowledges that, to be truthful, this testimony could not have been consistent. Remember, the memorandum of understanding is entered into after the 2001 incriminating statements, and it's entered into after I believe it was June of 2007 was the video, the second one that the court thankfully pointed out, the distinction. These were all known. All the evidence that had come in at her trial and the receipt establishing what time they would have been at this convenience store, that she had never said anybody approached her vehicle, these things were all known when they entered into the agreement. The obligations of her with the agreement are spelled out. She can't be inconsistent with that 2007 videotaped interview if she is to testify, and there's nothing in this record suggesting that she would have been or wasn't trying to be. She otherwise cooperated in terms of meeting with the state. There's really nothing to show that she unreasonably acted in a manner of breach of her obligations. Did you have a question, Your Honor? Yes, I did. What is the standard of review that we use to review the trial court's decision with regard to the memorandum of understanding? The case law, there's a policy of it because a lot of the case law that's analogous has to do with actual plea bargains, and this is a little different. I think it's analogous, and I think you could look at it under that standard as well, but what the case appears to develop here is where the interest of justice and fairness is within the trial court's discretion.  Isn't it a de novo review if you're looking at it from somewhat of a contract theory? Well, I would agree. Contract principles do apply to agreements. But this is not a question of law, is it? I mean, we're not reviewing a question of law here. I think it's a mixed question of fact and law. The facts, as the trial court knew them, are admitted here, and the question is the legal effect of those facts. I would submit it is a mixed question of law when you bring the contract principles into it, and the overriding standard of review is abuse of discretion. You're looking at the interest of justice and fairness. And you're saying this was a contract again. What was the consideration on both sides? Her consideration was, it's spelled out in the thing, in the brief, I apologize. It states that Jennifer McMullen hereby agrees to unrestricted interviews, any time, place, et cetera, regarding the events alleged in the indictment. She'll at all times tell the truth, hold to nothing but the truth during these interviews and while testifying. She'll testify truthfully, completely at proceedings, so her testimony, if called. And then it says, truthful testimony is understood, and they referenced the June 6, 2007 videotape. They don't reference the other one, but it's there. It was known. All right. And then the state? The state would not object at the sentencing hearing to the request and would recommend the, I believe it was 12 years, but it was such a number of years that effectively she could obtain release. It was 402'd. There was a 402 conference. It was 12 years. I believe it was, which would effectively at this point get her pretty close to release. Isn't it true that the assistant state's attorney interviewed her and asked whether or not somebody came up to the car, the victim, and the state's proof would indicate from the employee of the business that was robbed that one of the defendants came up to the car three times. And the defendant took the position that that never happened. And on the re-interview of the defendant, she stuck to her story, which was consistent with the 2007 statement. That's correct. And that made the assistant state's attorney more or less feel that she wasn't going to testify truthfully. Right. But she couldn't testify both ways. Exactly. And, you know, the interesting thing about it is, first of all, I don't believe there's any proof in the underlying testimony that it necessarily was defendant's car or the car of the perpetrators either. You know, so if she hadn't said that before and she was to remain consistent in testifying as the agreement defines it specifically, she couldn't have said that. Secondly, I would say, I don't want to lose my train of thought on it, it was Suzanne DiCicco who first said that three weeks after the crime that somebody at the restaurant had come. It was Suzanne DiCicco who said that three weeks after the crime, before these police, even Jennifer McMullen, existed. That's what she said to Elizabeth Schwartz that's in evidence when she started her numerous confessions. Let me go back one. My understanding is the one, the employee is the one that said he saw. Right. But Suzanne DiCicco said that three weeks after the crime, before that could have been known to anyone. There had been no hearings. They didn't know who McMullen was. The state's agreement was that if this was going to be enforced, this memorandum, was they were only going to refrain from objecting to her motion to vacate the conviction. Correct. Isn't that right? No. Isn't, there's more to it? Because if that was what the state agreed to do, the trial court doesn't have, didn't have to do that. Yeah, it wasn't the motion to vacate the conviction. I believe it was the motion for the new sentence as opposed to vacate the conviction. There's a distinction there. And they never got that because the state did object. And the trial court did not tell the state to. I'm going back to what the record reflects the state agreed to do.  So you're saying the state was going to do more than refrain from objecting to her motion to vacate the conviction as part of her post-conviction proceedings. The state was, to my understanding, and I apologize I didn't quote that part of it. What I have in front of me was to double check the record. But my understanding was the state, the state's obligation was to not object to her request for a new sentence as opposed to vacate the conviction. They did object to her vacating the conviction. We're not claiming that they didn't, couldn't object to that. I'm just saying that I'm going back to the consideration, what the state had agreed to do. And to recommend 12 years. Pardon? And to recommend 12 years that was agreed to. But what if the trial judge did not vacate the conviction? Then what would have happened? Then we have a different appeal. Then we have a full record based on what was presented fully at the motion to reduce the sentence. We have the state making their record. We have the judge giving his decision. If this were enforced, then what would happen on remand? Now, what would be the steps? A new sentencing hearing. A new sentencing hearing is what ultimately was denied. My memory was that the agreement was limited to should the pre-robbery conviction withstand. And I got the impression that the murder conviction would be vacated. I can be corrected on that. I could be mistaken. I'm sorry. I don't have it in front of me, but it's in the record. And ultimately, I think it would have been recommended 12 years on a remand pre-robbery conviction. But that did not occur at that hearing. And if the court is not bound by it, if the court won't do that, then maybe the defendant has a different appeal for another day just on that little issue. I don't have anything else unless the court does. Thank you so much. Thank you very much. At this time, the court will take the matter under advisement and render a decision in due course. Court stands in brief recess. Thank you. Thank you.